Good morning. Good morning. May it please the Court. I'm Narendra Ghosh of the North Carolina Bar. Along with Michael Fayette, I represent the plaintiffs. Health insurance coverage is about risk. Who bears the risk? In 2003, the UAW and individual retirees settled two lawsuits against defendant SPX. These union workers had to sue because SPX was threatening to reduce their health insurance and break promises that they had made after a lifetime of work. The settlement agreements guaranteed the retirees comprehensive health insurance for life. The retirees no longer faced the risk that they would ever be unable to pay for the health care they needed. They could go to sleep at night secure, knowing that they might have to worry about their health, but they wouldn't have to worry about how to pay for their health care. As of January 1, 2015, SPX violated those settlement agreements when it unilaterally replaced its group health insurance plans with health reimbursement accounts, which are basically vouchers for medical expenses. This switch shifted risk from SPX to the retirees, including the risk that the vouchers wouldn't be enough, the risk that the appropriate insurance plan wouldn't be available, the risk that political changes would upset the insurance market. So you're offering this argument to us today on the likelihood of success on the merits, because we are just here on the preliminary junction, are we not? Yes, sir. Yes, Your Honor. So you're offering this argument as to why there is likelihood of success on the merits? Correct. What's happened to the rest of the case? It has proceeded in the district court. The trial court bifurcated discovery. Phase one of discovery was on discovery on class certification. That has been completed, and plaintiff's motion for class certification is pending before the court. So at the moment, then, discovery is not ongoing at that moment. So SPX's unilateral imposition of HRAs broke the deal that was struck in the settlements, and it violated the plain language of the settlements. Plaintiffs have brought this suit because SPX is trying to break back out of its promises again. The agreements require SPX to provide retirees with coverage under specific group health insurance plans or its, quote, substantial equivalent. The provision defining that term, key language here, states that this requirement, quote, shall be deemed to require only that SPX provide coverage which is substantially equivalent in benefits. Explicit in that obligation are two requirements. First, that SPX provide coverage, and second, that the coverage be substantially equivalent in benefits. Regardless of whether the benefits are equivalent, the HRAs violate the first requirement. They are not coverage. As courts have consistently found, the term coverage means the inclusion of certain risks under an insurance plan. By requiring SPX to provide coverage, the settlement agreements require SPX to provide an insurance plan covering certain medical expenses. The other provisions of the settlement agreements, including repeated references to insurance plans either funded by SPX or funded by a carrier, support this plain language interpretation. The party's history under the agreements where SPX several times changed coverage but always provided group health insurance plans that were funded by SPX or a carrier, also support this interpretation. As of January 1, 2015, SPX ceased providing insurance plans. Instead, it merely makes some amount of money, a certain amount of money available through an HRA, leaving it to the retiree to select and purchase some other insurance plan or pay for medical expenses and then seek reimbursement. If the amount of money proves insufficient, the retiree has to pay out of pocket or forego medical care. In other words, the ultimate risk of loss is borne by the retiree instead of by SPX or SPX's insurance carrier. The risk that insurance becomes more expensive or unavailable altogether is borne by the retiree instead of by SPX. This is not providing coverage as required by settlement agreements. So the district court erred in concluding that plaintiffs are not likely to prevail on the merits. The district court also erred in finding that plaintiffs had not demonstrated irreparable harm. Had not been what? Had not demonstrated irreparable harm. When SPX unilaterally switched from providing insurance to providing HRAs, 28 percent of the retirees didn't sign up. Twenty-eight percent of the retirees, almost 250 of them, dropped out of the system. Does the record show whether they had other coverage through a spouse or any other source? Or are we simply left to speculation as to whether they had coverage otherwise? The record does not show one way or another. Nor is there any evidence that they used their HRAs to reimburse themselves for other medical expenses, even though SPX could have provided that evidence if it existed. And the most reasonable inference is that these individuals simply did not replace the insurance that SPX had been providing. They could have been covered under a spouse's policy, could they not have? They could have. Yeah. That is possible. But certainly, and certainly some of them may have been, but a fair inference is that a large number were not. And so you have north of 200 retirees on a fixed income facing a substantially diminished amount of insurance. A number of courts have reached the conclusion that that constitutes reparable harm. And so the district court abused its discretion by failing to consider this fact entirely. The district court also erred in finding that plaintiff's claims were moot. As this court has recognized, the district court could have issued a preliminary injunction to restore the status quo, even after SPX had ceased providing health insurance. This court and others recognize that a request for a preliminary injunction is only mooted where the act sought to be enjoined has occurred and where the court has no feasible way to restore the status quo. Here, the district court could have ordered SPX to reinstate the health insurance it had been providing. Right. And so, though, doesn't that raise the question of why you don't have an adequate remedy at law? Why or how have you qualified for injunctive relief when the court could have, as you said, just simply ordered the coverage? I mean, wouldn't they have a claim for damages? In other words, if the court could have ordered coverage from this day forward, wouldn't they have had a damages claim for any damages that they had suffered up to the time that the district court agreed with you on the law? There would be a damages claim. But as a number of courts have recognized, when you have retirees on a fixed income, you can't assume that they could just replace their insurance with savings that they have and get all of the medical care that they otherwise would have received. If these were high-earning executives, that would be a problem. Oh, no, I understand. These are not sophisticated parties. I'm completely with you on that. I mean, it's a very sympathetic situation. I guess what I'm having trouble, though, is why they couldn't have gotten damages for their situation prior to the district court. It seems to me they could have gotten damages for this breach of contract if, in fact, it was a breach of contract. So to make sure I'm understanding Your Honor's question correctly, you mean if at the end of this case when the district court makes a final decision on the merits, when it finds that there is a breach of contract, it could award damages. That is true. But the damages would be inadequate because by not replacing the health insurance that they had for so many years, what happens for retirees is that they either forego medical care that they otherwise would have gotten or they are paying for medical care out of the pocket and foregoing other necessities of life. And so we've cited a number of cases in our brief from the First Circuit and the Sixth Circuit showing that where retirees lose health insurance or have significantly diminished health insurance, that's irreparable harm that justifies a preliminary injunction. I'm sorry. No, no, you go ahead. I'm just wondering why it took so long to get this thing ruled on in the district court. You filed it before the January 1 date, right? Yes, Your Honor. Did you ask for a TRO? We did not. Did you ask for a temporary restraining order under Rule 65? We did not seek a TRO, Your Honor. Why didn't you push it harder? Well, we filed the motion of preliminary injunction on December 15th. It was 15 days before the system was going to change. Yes, Your Honor. Why didn't you push it harder? I mean, you can seek a temporary restraining order. You can move. Injunction proceedings are supposed to go to the top of the list, aren't they? Well, we had to. You're in the next fall before there's a ruling. Well, we did not expect the ruling to take so long. We filed the motion of preliminary injunction in December 2014. It was fully briefed by mid-January 2015, and then it was not ruled on for over eight months. So it was in the breast of the court for eight months? Yes, Your Honor. Were you complaining that you didn't have a ruling? We made inquiries with the court and the court's office to inquire about a ruling. Did you file any motions to expedite or get it? We did not file a motion to expedite. You didn't go in and move for a TRO or something to hold it in place until you got a ruling on an injunction motion? I mean, it looks to me like you can do something to stir it up. Well, I mean, when we filed the motion for preliminary injunction, the district court issued an order right before the end of the year saying that it would not make a ruling until the issue was fully briefed. And then the issue was fully briefed within about three weeks, and then we just did not get a ruling. No, but then the mootness thing, they used that delay against you. Well, I mean, they are now using it against us, but the principle that's well established is that... I mean, you're a year and a half down the road, and you're up here taking an appeal from the denial of the preliminary injunction, and you don't have a trial date. You're still working on other things. We certainly do not have a trial date as the discovery is... You can merge the preliminary injunction and the merits of the permanent injunction proceeding under Rule 65 and get it all taken care of right away. I mean, it's in the rules. But anyway, maybe that's well water over the dam. But they're saying it's all moot now because they put the thing in place on January 1, and it's too late to try to unwind it all. I think that is certainly incorrect. As this Court's cases have shown in the Aguero case, that was a case... The Aguero case, if I recall it correctly, was one of the cases I was involved in. And I was just involved with one fellow, right? Yes, Your Honor. I was involved with terrible injuries, but involved one man. You've got a large group of people that are involved in a health care system. This guy was trying to get... Aguero was trying to get medical care for himself. He had the injuries, and nobody wanted to pay for them. And he was out on the street. Somebody had to do something for the guy. Right. But that case showed that the employers in that case had ceased providing his medical care before he moved for a preliminary injunction, and then this Court said he could still get a preliminary injunction to order them to reinstate his medical care. The Pashby case from this Court was a class action involving... It was a paraplegic, and they threw him out of the hospital or something, wasn't it? It was a heck of a mess. Yes, Your Honor. But the Pashby case involved a class action where the State of North Carolina was changing its Medicaid regulations that would have affected over 2,000 people. The regulations were set to go into effect on June 1, 2011. The plaintiffs filed suit on May 31st, the day before they filed suit and moved for a preliminary injunction. The regulations went into effect. The preliminary injunction was then issued six months later, almost six months later, basically reinstating the previous legal regime and undoing the regulations. And this Court affirmed that preliminary injunction. This Court is similarly in the Hines case from 1988, which involved a foreclosure where the foreclosure had been, after the district court denied injunctive relief, the foreclosure occurred, but this Court reversed rejecting mootness arguments because the foreclosure could have been undone. So there's nothing that prevented the district court from reinstating health insurance when it did finally rule in September, and there's nothing that prevents it from this court doing so or for the district court doing so on remand. You know, the only, the principal case that defendants relies on is the HCI case, which was an unpublished case where the plaintiff conceded the issue of mootness. And I think that the logic of that case has been rejected in this Court's subsequent published decisions, and that case was even inconsistent with its prior decisions, as well as the Supreme Court's Porter v. Wade decision. If there are no further questions, I will reserve the balance of my time for rebuttal. Thank you, Mr. Ghosh. Thank you. Mr. Hiller? Good morning, Your Honors, and may it please the Court. I'm Mark Hiller on behalf of SPX Corporation, and I'm here with my colleague, Mr. Kerry Davis. The district court in this case was correct to deny the plaintiff's request for a preliminary injunction, both because the request was moot and because, in any event, the plaintiffs did not show any of the four factors that are required under the winter analysis. In this case, normally I would begin in terms of order of operations by starting with what are the two, you can call them threshold issues. One is mootness, and the second is, on the first prong of the winter analysis, one of the arguments we make is that, and that the district court discussed in its opinion, is that the plaintiffs did not respond to several threshold merits arguments we made before getting into the main merits question of what the contract in this case allows. Normally I would begin with those issues, but in this case, unless the Court has a contrary preference, I'd like to jump right to the issues of irreparable harm and the meaning of the contract, because the impression that I want to make sure I correct or dispel is that there has been any form of reduction in benefits in this case. And so to start sort of at the beginning, most cases, or at least many cases involving retiree benefits disputes, involve a dispute over whether the benefits have vested over the course of the retiree's lives. Here, there is no dispute as to that. SPX, as we explain in our briefing, fully acknowledges its commitment to provide lifetime benefits consistent with the level specified in the agreements. So the question we have here is whether the HRA program that SPX has implemented, now two and a half years ago and running, is consistent with that agreement. And from the beginning of this case, the plaintiffs have tried to frame the case, understandably, as one involving a reduction of health insurance. And then they point to other cases, outside of this court or elsewhere, where you have had reductions in health insurance and where plaintiffs have obtained relief. And what we showed the district court in detail was that that framing of the issue is emphatically not the case. And we went through point by point in the district court, unrefuted by the plaintiffs, first to explain the details of the HRA program. We explained how the amount of funding in this case is one of the most generous programs offered by any company anywhere in the country, period. We didn't leave it at that level of generality, but we dove down and we explained to the court the actuarial assumptions that went into calculating the specific funding amounts in this case. We explained, through declarations from the actuarial firm, how the assumptions that went into generating that amount were all drawn conservatively in favor of the retirees, including just as some examples, assuming an 85-year-old average age, which was older than the average age in the settlement classes. Calculating the necessary amount of funding by reference to what's called a Medigap F plan, which if your honors are not familiar is the Medicare supplemental insurance plan that's generally richest in benefits among the Medicare supplemental plans and which is richer in benefits than the group coverage that many of the retirees had. And how then we added another $600 just to provide an additional cushion. We also explained understanding that, of course, it's a vulnerable population. The third-party sort of administrator, a company called One Exchange, that has a special expertise in dealing exactly with this type of population. One Exchange. They were the ones that were going to help pick out their, get a good plan? Correct. So these are the individuals. If you were a retiree and you say, okay, how do I do this? You can call One Exchange at any time. One Exchange is both a marketplace that offers plans through their own marketplace, but you don't have to purchase through them. But you can think of them as essentially an insurance broker who will talk you through the steps. We explained the incentive structure, that they're not paid on commission, that they receive bonus payments for good reviews. We showed the court that the retiree population in this case gave them a 4.2 out of 5, et cetera. And so we walked them through step by step. We also, still on the issue of reparable harm, we went point by point through the plaintiff's analysis. In the cases that they cite, all of those cases have two features, neither of which is present here. Feature number one is that those cases involve an actual reduction, or in some cases an outright elimination of health insurance. So the Textron case from then-Judge Breyer was just, we're not going to pay your premiums anymore. Other cases are, you can get your insurance, but we're going to charge a lot more for the premiums for you than before. So those cases involve, number one, an actual reduction. And then number two, beyond that, they involve actual individualized evidence from the plaintiffs. For example, an affidavit, a declaration, live testimony, showing that a particular individual or individuals, because of the reduction, will not be able to afford care. So you're saying there's a failure of proof here? I'm saying, to jump to the bottom line, yes, there is an affidavit. Has there been discovery? Well, there Most of them have experts? How are you going to prove this, what you're telling us? Exactly, yes. So there was evidence, right, in the preliminary injunction hearing, and that's what I'm leading to. There was a hearing, and there was evidence presented? It was not Have you all finished the discovery yet? So the evidence in the record before the preliminary injunction were declarations and other written material. There was not a live evidentiary hearing at the preliminary injunction. Well, what's going to have to happen to the case now to get it resolved? Right now, the class certification issues have been fully briefed. If the case proceeds to certification, then there will be merits discovery in which these and other issues are addressed. Then there will have to be a trial? Yes. Would there be a jury trial or a trial of the court? I believe that that has not been resolved yet. But if I could go back, the key point I wanted to make was that the only evidence that plaintiffs put into the record to support their arguments of substantial harm, and where I'm going with this is that plaintiffs, in relying now on the 72 percent figure and the 28 percent figure, this is a change of evidence, and they have abandoned the evidence that they relied on below, and that's the key point I want to get across. The sole evidence they offered below to try to substantiate their arguments were six brief affidavits that they submitted along with their preliminary injunction motion. And we responded in our opposition brief to the district court, and we showed why none of those affidavits supported their position. We showed that two of the affidavits were not even by class members, and the other four, every one of those individuals had already enrolled in insurance. They raised speculative or general concerns, but nothing concrete. And they offered no other evidence at all. We then, in our opposition brief, explained the points I made before, and we also noted that as an evidence of the success of the transition, that as of December 22, 2014, 72 percent of individuals had enrolled in a private individual plan through one exchange. And we then explained to the district court why it should not be alarmed or why it's not unnatural that that number is not 100 percent. For one thing, the enrollment deadline was not December 22, but there's a 63-day grace period following January 1. So the actual deadline would be in early March. We also explained that you could have people who enroll, just like Your Honors were questioning, you could have people who enroll outside of one exchange, as during the class certification portion of discovery, one of the named plaintiffs testified that he did. You could also have individuals who have coverage through a spouse. Now they're really getting a better deal because you have spousal coverage plus your HRA amount. Or you could have individuals who say, you know what, I'm fine just keeping underlying Medicare, meaning Parts A and B, which exists independent of this system. Most importantly, Your Honor, the plaintiffs in this case have not put forward a single affidavit. They have not moved to supplement the record. Any evidence of any individual to substantiate their speculation that you have this group of, as they would tell it, 200-plus people who just have somehow slipped through the cracks. In addition, we also showed that by March 2015, three months into the program, one exchange had contacted by telephone or mail all but 10 of the approximately 900 retirees. So the notion that, you know, yes, is it a theoretical possibility that 28 percent of individuals were not enrolled? I suppose it's a theoretical possibility. But if you look at the briefing in the district court, I think, you know, what explains the district court's decision is that it understood very clearly that this case is not, or is nothing like the cases that they rely on. And that's the key. And to follow up on some of Your Honor's questions as well, I mean, I think your point, you asked about, you know, why was there not more urgency on my friend's part? I mean, I don't want to speak for them, but I think the point is that you could certainly infer from that, or to Your Honor's question about why is there not an adequate remedy of law, is that, you know, yes, there is. That their theory on this preliminary injunction appeal is that you've had ongoing irreparable harm now for two and a half years. Well, if that's really the case, just sort of stepping back the common sense of it, where is the evidence, you know, where is the urgency compared to yesterday's argument where the order was issued out of Maryland, the appeal was filed the next day, motions to expedite, here they took, even if you can agree with their arguments on why it took them six months to respond and eight months to file their complaint, they still have no answer to why they did not file a TRO, to why they waited the 30 days or approximately 30 to file a notice of appeal, to why they did not ask to expedite the briefing in the district court, knowing to get into mootness for a second that by the time the briefing was complete, the transition would, you know, be completed, et cetera. So I think that also speaks to, in other words, I just want to give the Court some comfort in that this is absolutely not a reduction in benefits case. SPX has absolutely, in our view, complied with the settlement agreement, and most importantly, in an abuse of discretion posture, and again, I urge, you know, the Court to take a look at the district court briefing if it's helpful. I think the district court understood that this is simply not a reduction in benefits case. Now on appeal, you don't see any reference to the affidavits they've offered. They've essentially abandoned it, and somewhat ironically, their sole evidence is the 72 percent figure to which I've responded, and that evidence was actually our evidence. So again, so I think those are the two. So you think that's pretty good, 72 percent? I don't want to say pretty good or not. We don't know what to make of it. I mean, you say one thing and they say another. Well, I think what I say is that their argument is, first, nothing like the sort of individual. I mean, you know, they are the union. They know the retirees. If there were evidence over the last two and a half years of individuals who simply don't know how to obtain insurance, it is just extremely unlikely, I think, that they have not, you know, that that would be the case, but without any evidence on their part. But I think for all these reasons, I hope it's clear from the briefing that this is not an irreparable harm case and that certainly the district court did not abuse its discretion on this record in finding no such harm. They also fault the district court for not explicitly citing the 72 percent figure. Again, it has to be put in context. The evidence they offered were these affidavits, not the 72 percent. We offered that in our opposition brief. In their 15-page reply brief, they mentioned it in a single paragraph. So it's natural that the district court would not specifically cite that figure. And even then, the district court on page 7 of its opinion says that their evidence is essentially conclusory. And, again, it just stands in stark contrast to the kinds of evidence that other cases use. I also would urge the court in particular. There's a Third Circuit decision in Adam's case which addresses exactly these issues of irreparable harm when the plaintiffs are seeking a mass injunction as to, you know, 100-plus people. In our case, we have 900. And it's consistent with all of the arguments I'm making here. But at the same time, if there's not further questions on irreparable harm, I'd love to move to the merits and explain our view of the contract and then also get to mootness in this threshold issue. Seeing no questions, I shall proceed. So the merits of the case, again, there's no dispute here. This is not a yard man which has now been overruled case where there's a dispute over have benefits vested. So we agree there's lifetime health care benefits. This is just an ordinary contract dispute where the question is arising from these two materially identically worded And the underlying merits question is, is the HRA program allowed under those settlement agreements? And as plaintiffs acknowledge, and these are some important points, ordinary contract principles apply. And appropriately, the plaintiffs do not claim that they benefit from any presumption or thumb on the scale in their favor. Instead, it's just normal contract interpretation with the ultimate goal of discerning the party's intent, looking first at the plain language of the agreement. And so if you look at the agreement, the way the settlement agreements are set up, is that Section 5.1 of each of the agreements creates the obligation that is at issue in this case. Section 5.1, I don't think it's quoted in the blue briefs, it's at 497 of the record, but the key paragraph I'm going to read from is at page 37 of the red brief. And so Section 5.1 says that SPX shall provide coverage under a specified plan or its substantial equivalent. So for example, just to read, this is from the LNN agreement, SPX shall provide coverage under the Keystone plan or its substantial equivalent. And then the question is, okay, but what does that phrase mean? And the answer comes in Section 5.6 of the Muskegon agreement and the identically worded 5.8 of the LNN agreement. And again, that's at page 37 of the red brief. And that is a definitional paragraph that defines the phrase provide coverage under a specified plan or its substantial equivalent. And the language we would focus on in the first instance is the last line where it says that that obligation shall not be deemed, quote, to regulate or affect the manner in which SPX makes such substantially equivalent benefits available, end quote. And so under a plain reading analysis, the way I approach it is I would say, okay, does the HRA program do the things in that sentence? And the record evidence that we showed to the district court was 100 percent yes. It makes such substantially equivalent benefits available. So I would say at the very start, you know, forgetting for a second that the additional hurdle that plaintiffs have under winter on a preliminary injunction appeal, just under the underlying merits, the plain language authorizes the HRA program. So I think the burden is really an uphill battle on the plaintiffs to try to explain what is the language that doesn't allow it, or put differently, why should the court not just give a plain reading? So is it your position that the plaintiffs were arguing that coverage equals group coverage offered by the employers? Yes, Your Honor. The plaintiffs' position in this case is, or put differently, it's as though they are reading words into the document. Well, that's what I was going to ask you. So, yes. So you're saying they were adding the word group to the contract. Yes, or more precisely in sort of Medicare parlance or insurance parlance. Their position in this case is that, is as though the agreement were to say that the only way that SPX can make substantially equivalent benefits available is by, is through an employer-sponsored group plan. That's their position. And the first level of response to that is, but the agreement doesn't say that. That's why they have to try to wring that meaning out of neighboring provisions by making contextual arguments, because the textual argument, which should be the beginning and the end of the underlying merits case, and is the beginning and the end, I would say, on a preliminary injunction appeal, favors us. The only textual argument they make is the sentence, again, on 37 of the red brief. They focus on the words that the obligation means that requires, quote, only that SPX provide coverage which is substantially equivalent in benefits. And they say that provide coverage means provide coverage through a group policy. And the problem with that is, number one, it conflicts. You would read the final line out of the clause. But additionally, Your Honor, I think that the paragraph fits together as a cohesive whole in that what, in other words, I think my friend is misreading the language. When it says SPX must provide coverage which is substantially equivalent in benefits, what it's saying is, is that the focus is on benefits. It's not focusing on how you deliver the benefits. It's focusing on what the benefits are. And then the next portion of the paragraph makes clear explicitly that it's not focusing on the manner. And so, in other words, the paragraph draws a distinction between benefits on the one hand and the manner on the other, which is consistent with the basic bargain struck in the document. So we have a structural argument as well as a textual argument that, on the one hand, we are agreeing to provide lifetime vested benefits at specified levels where they're substantial equivalent. But on the other hand, we get to determine unilaterally, as a bargain for position, the manner in which the benefits are made available. And they have every right to challenge under the word available whether an HRA program actually does that. But given the total lack of evidence they put on in the district court, the court was absolutely correct and certainly did not abuse its discretion. If I could move on, I see as my time is running. I just want to touch on mootness and the threshold class certification issue. I wanted to address those two first because I wanted to allay any concern by the court that you have a vulnerable population that's not being taken care of here. On the mootness issue, the case is moot, or not the case, rather, but this appeal. Their specific request in the injunction was to stop the transition from occurring. That is at page 241 of the joint appendix. The transition has now occurred, so there's no dispute that that literal request is moot. The question is, well, what about the request to unwind the transaction? And what we explained to the district court is that this is not flipping a light switch on and off. And Your Honor, Judge King is absolutely correct. In the Agaro case, which is their principal authority, it was a single individual whose hospital bills were not being paid. But what we explained to the district, not a 900-person case where you'd have to undo machinery, but what we explained to the district court are the various practical difficulties. And the key point with that is that all of those difficulties have now been exacerbated and grown in the 18 months since the court has issued its decision. So basic questions such as, do the group policies still exist? If not, how do you find new ones? Does the retiree census information have to be recreated from scratch? Finding vendors? And most importantly, what about all of the retirees who now have individual plans and who may not even have knowledge of this lawsuit? Again, it's a putative class action at this point. The point is that all of the – I see my time has expired. If I may finish the point. Yes, go ahead. Thank you, Your Honor. The point that we make in the briefs and to make the argument in its simplest terms is that all of those knotty practical questions will be addressed by the district court in due course if this case proceeds past certification and to a final judgment in plaintiff's favor. But as we explain, and we cite the McLean case from the First Circuit, a Ruschini case from the Third Circuit, and a Bancorp case from the Second Circuit, all of those courts explain that it would be inappropriate on an interlocutory appeal like this for the appellate court to prejudge prematurely issues that have not been developed on a full record. And I probably don't have time to talk through each of the cases they cite, but the sort of brief points I would like to make are that the Agaro case, their principal authority does not even present the issue in this case because there, in addition to the point Judge King made, there the status quo changed. The defendant stopped paying the bills before the plaintiff moved for a preliminary injunction. There was no, you know, mid-litigation change. And again, then the relief, there was no question as to the feasibility. It was just paying a money judgment to pay the individual's bills. That basic point that all of their cases were ones where there was no question as to feasibility, including the Paschke case, if you look at the district court opinion in the case, the district court expressly addressed the feasibility and said there's no problem. Every one of their cases involves relief where it's more akin to flipping a light switch back on after it's been turned off, reinstating an employee, not foreclosing on a home. They don't cite any case that looks anything like this. And the reason, Your Honor, I submit, respectfully submit, is that the cases that do look like this are dismissed as moot. So I know I'm over time. I didn't get a chance to address the threshold issues. I just have one question for you. As Judge Keenan aptly said, we understand this is not a sophisticated group and potentially vulnerable group of retirees, so we don't ascribe any kind of sophistication to them in terms of their rights. But looking through that lens, why do you think that they are upset and don't perceive this sameness as you do in terms of there's no reduction? How's that? Well, you know, I think that, I mean, so obviously I am speculating. Absolutely. I'm going to ask the other side. Step out of the lawyer's role. Because you make it so plain that it is not. Why would they perceive from their lens of, you know, in other words, feeling vulnerable to retirees, you know, changes kind of causes angst in all of us to some degree. But what is it, do you think? If you don't know, just so you don't know. Yeah. Well, I don't know, but another, I mean, a key point I'd like to make is that the record you're reading is from I don't want you to re-argue the record. No, no, no, I understand. I know for lawyers it's hard to do it. You're not going to be held until you give it up. No, no, no, I understand, Your Honor, but it goes to directly answering your question. All right. The angst that comes across in their briefing is from a record that's two and a half years ago. And so I would take issue potentially with the premise of your question that the retirees don't like this. They've now had, in other words, the material you're seeing is from the transition period when naturally there would be uncertainty. What will this look like? Well, my insurance was fine. Why do I need to change? What's happening? But now we have two and a half years of experience. And, again, what they haven't produced, I mean, again, it's a 900-person putative class, but brought by six individuals who are claiming to represent everyone else. And as we explained, you know, there's serious conflict of interest problems because every single retiree was paying out-of-pocket expense under the group plans. The individuals, approximately 250, who were additionally contributing to their premium payments under the group plans, were facing rising premiums every year under the group plans. For example, a Muskegon employee, a retiree, who is required to contribute 50 percent of his payment would be paying potentially $2,800 to $2,900 out-of-pocket. So when you say, when the question is, well, why would they not appreciate it, is that I guess I would first take issue with the premise that I would want to, you know, see what happens in merits discovery as to whether they do, in fact, you know, approve now that it's two and a half years later. And that also, you know, to conclude is I think the district court understood that, that the program does provide benefits. And it also shows that, you know, helps underscore the mootness point that this is just a first-class logistical mess to unwind it on a preliminary basis, two and a half years later when a trial, you know, for all we know, could occur in 2018. But I want to make sure I've answered your question. You have indeed. Thank you so much. Thank you, Your Honor. All right. Mr. Gosha, your learned colleagues here, we may be tilting at windmills here, but there really is no problem at all because it's, in fact, equal coverage and no reduction. And there's not really any wholesale perception otherwise. We respectfully disagree. I figured you would, but tell me why this is wrong. Well, let me touch on a couple of points. Why is this not a reduction? First of all, two things. There has been a reduction in coverage for those 28 percent of people. But he's saying there's a failure of proof. If you haven't said what those 28 percent of the people are doing now, what's their status as to whether they've obtained other coverage through other sources that haven't cost them any money? The record is as honest as that. But I think the fact that they don't have SPX coverage that they have relied on for 10 years, the reasonable inference is that they haven't replaced it, or at least a substantial portion of them have not replaced it. And SPX certainly has not produced any evidence to the contrary. And given the risk here, given that what we're talking about is retirees who are losing part of their health insurance coverage, living on fixed incomes, who may not be able to afford their health care, that risk is so significant that it's irreparable harm. And other sources have recognized that. But they have some health care. They've got Medicare, he says. They do have Medicare. That is correct. But Medicare still has significant gaps that impose significant costs, particularly for prescription drugs, particularly for Part B. And that's why you have all these plans of retirees. They wouldn't be classified as uninsured if they have Medicare, right? They're not completely uninsured. That's correct, Your Honor. And I would note that the Textron case by Justice Breyer while he was on the First Circuit found irreparable harm. He didn't have detailed affidavits before him. He was able to use common sense and say, based on the fact that these are retirees on fixed income who have diminished health insurance, that's irreparable harm. And he didn't rely on a bunch of detailed affidavits to do that. And the number of other courts have done the same. But the First Circuit decision is not precedent here. That is correct, Your Honor. And let me say a couple of things. Now, why is this not such a great deal? I would point out that what SBX is doing here is not unprecedented or incredible or some deal that no one else has been offered. And I would point this Court to the Sixth Circuit case, the Steelworkers case versus Kesley Hayes, the 2014 decision cited in our briefs. In that case, the company replaced group health insurance plans with HRAs, $4,800 a year plus $15,000 up front. And the Sixth Circuit affirmed the ruling that that violated the collective bargaining agreements because that was not the type of coverage that had been bargained for, first of all. Did this contract entitle you to employer-sponsored group coverage? Is that your position? Our position is that it entitles retirees to coverage. To coverage with substantially equivalent benefits. So you're agreeing that it did not entitle you as a matter of contract interpretation to employer-sponsored group coverage? It has to be insurance coverage. It's employer-provided because SBX is the one who's supposed to provide it. So it has to be employer-provided insurance coverage. And we are not just looking at the whole agreement. We're looking at the specific words. Section 5.8 of the agreements require only that SBX provide coverage, which is substantially equivalent to benefits. Now, the details of how the coverage provides its benefits is left up to SBX. It can be through an HMO or a PPO or requiring referrals from a primary physician. That's what it means when it says it doesn't regulate the manner in which SBX makes the benefits available through coverage. But they have that flexibility. What they don't have the flexibility to do is stop providing coverage. That's what they've done here. And as the Sixth Circuit said in that Steelworkers case, HRAs are not insurance coverage. They are vouchers. And they put the risk on the retirees. And this I want to get to Chief Judge Gregory's point here. Why do they oppose this? And it's not just that they're entitled to it under the contract. It's that HRAs may be better for some retirees and worse for others. HRAs may be an okay deal now but a terrible deal later. HRAs may work a bit if you can navigate the complicated purchasing system but fail entirely if you have cognitive limitations. The problem is that all of those risks are now on the retirees. They didn't have those risks before. Their health care coverage was risk-free. They paid their minimum amount of premiums and copays. They got full health care coverage. Now they have the risk of health care inflation or of government changes to the entire marketplace or to the ACA or to anything else. If there's one constant in health insurance, it's that it keeps changing. These settlement agreements eliminated that risk for these retirees. SPX has now put that risk back on them. And it violates the agreement. The plaintiffs should prevail, likely prevail on the merits. And we've demonstrated it. You don't take issue with the actuarial assumptions you use in those calculations. It's just that you think the fact that it gives this potential risk to the retirees and not just group coverage, which is simple. You pay a premium. You got it. Is that the problem? At this stage, we are not taking this with the actuarial assumption. We will certainly, down the line, when we get to merits discovery in the trial court, we will be taking issue with the actuarial assumptions here. You also would take it, too, that you would say then that if you don't provide group insurance about an employer, it doesn't matter whether you have the same benefits reduction or not. That's right. Is that right? That's not your metric, right? The benefits is not your metric. That's not. That's not. It's not the only metric. The agreements require that SBX provide coverage. Second, they require equivalent benefits. But here they just fail at the first step. Is that a conjunction, you would say? That's right. It's a conjunction. And here they fail at the first step because this is not coverage. It's just cash, which may not be enough or may not be enough in 10 years or 20 years. And that risk is something retirees cannot afford and that they didn't have to afford under these settlement agreements. All right. Thank you. Thank you very much. I appreciate it. Mr. Ghosh and Mr. Hiller, we'll come down. We counsel. But after, of course, our esteemed clerk will dismiss his adjournance for the day. This honorable court stands adjourned until tomorrow morning. The Diocese of the United States and this honorable court.
judges: Roger L. Gregory, Robert B. King, Barbara Milano Keenan